1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9   GREGORY McKINNEY,                          CASE NO. 1:09-cv-00726-AWI-BAM PC

10                        Plaintiff,           FINDINGS AND RECOMMENDATIONS
                                               RECOMMENDING     GRANTING
11        v.                                   DEFENDANTS' MOTION FOR SUMMARY
                                               JUDGMENT
12   CALIFORNIA DEPARTMENT OF
     CORRECTIONS AND REHABILITATION,           (ECF Nos. 52, 60, 61)
13   et al.,
                                               OBJECTIONS DUE WITHIN THIRTY DAYS
14                        Defendants.
                                          /
15

16            **Findings and Recommendations on Motion for Summary Judgment**

17   **I.      Procedural History**

18        Plaintiff Gregory McKinney ("Plaintiff"), a state prisoner proceeding pro se and in forma

19   pauperis in this civil rights action pursuant to 42 U.S.C. § 1983, filed this action on April 24, 2009.

20   This action is proceeding on the First Amended Complaint, filed November 24, 2009, against

21   Defendants Hedgpeth, Harrington, Castro, Kays, and Soto for denial of exercise in violation of the

22   Eighth Amendment.  (ECF No. 18.)  Defendants filed a Motion for Summary Judgment on

23   December 12, 2011.  (ECF No. 52.)  After receiving several extensions of time, Plaintiff filed an

24   Opposition on April 11, 2012.[1]  (ECF No. 60.)  Defendants filed a reply on April 18, 2012.  (ECF

25   No. 61.)

26

27        [1]Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the
     Court in the Second Informational Order, filed September 16, 2010.  (ECF No. 23-1); Klingele v. Eikenberry, 849
28   F.2d 409 (9th Cir. 1988).

1

## II.   Motion for Summary Judgment

### A.   Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Summary judgment must be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  However, the court is to liberally construe the filings and motions of pro se litigants.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  The "party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323 (quoting Rule 56(c) of the Federal Rules of Civil Procedure).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record for consideration.  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The Court will not undertake to mine the record for triable issues of fact.  Simmons v. Navajo County, Arizona, 609 F.3d 1011, 1017 (9th Cir. 2010).

### B.   Defendants' Evidentiary Objections

In their reply, Defendants object to Plaintiff's Exhibit B as containing inadmissible hearsay

and lacking foundation.  Any party may object to the other's evidence on the ground that it "cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  As long as the requirements of Rule 56 are satisfied, the evidence submitted is not required to be in a form that would be admissible at trial.  Block v. City of Los Angeles, 253 F.3d 410, 419 (9th Cir. 2001).

To satisfy the requirement of authenticating or identifying evidence, Federal Rule of Evidence 901(a) requires "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Unauthenticated documents cannot be considered in a motion for summary judgment, Las Vegas Sands, LLC v. Nehme. 632 F.3d 526, 532 (9th Cir. 2011) (citing Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002)) (quotation marks omitted), therefore, lack of proper authentication is an appropriate objection where a document's authenticity is genuinely in dispute.

"An inquiry into authenticity concerns the genuineness of an item of evidence, not its admissibility," Orr, 285 F.3d at 776, and documents may be authenticated by review of their contents if they appear to be sufficiently genuine, Las Vegas Sands, LLC, 632 F.3d at 533 (citing Orr, 285 F.3d at 778 n.24) (quotation marks omitted).  Defendants are not challenging the authenticity of Plaintiff's medical records, contained in Exhibit B, rather they object on the purely procedural ground of lack of foundation.  In such an instance, the court should consider the evidence when deciding a motion for summary judgment.  Sanchez v. Penner, S-07-0542 MCE EFB P, 2009 WL 3088331, *5 (E.D.Cal. Sept. 22, 2009).  As to Defendants' objection based on hearsay, Plaintiff's medical records would fall under the business record exception to the hearsay rule.  Fed. R. Evid. 803(6).  Accordingly, Defendants' objection to Plaintiff's Exhibit B is overruled.

## C.    Plaintiff's Eighth Amendment Denial of Exercise Claim

### 1.    Summary of Plaintiff's Allegations

Since July 2007, due to policies promulgated and implemented by Defendants Hedgpeth, Harrington, Castro, Kays, and Soto, Plaintiff has been subjected to continuous and successive lockdowns which resulted in months of denial of outdoor exercise.  Plaintiff claims that the lack of outdoor exercised caused him to suffer muscle cramps, back pain, headaches, stress, and anxiety.  (First Am. Compl. ¶ 13, ECF No. 18.)  Plaintiff contends that the lockdowns continued, even after

the disruptive inmates were removed from the general population in violation of the Eighth Amendment. (Id. at 19.)

## 2. Undisputed Facts

1. Plaintiff, a prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), has been incarcerated at Kern Valley State Prison ("KVPS") since January 11, 2007. (Esquivel Dec., Exh. Q, 2.)

2. Plaintiff is African-American, and he is not a member or associate of a gang. (Esquivel Dec., Exh. Q, 4.)

3. From March 2007 to August 2009, Plaintiff was housed in Building 8 on Facility B at KVSP. (Esquivel Dec., Exh. Q, 5-9.)

4. Defendant Soto was the Captain of Facility B, and Defendants Hedgpeth, Harrington, Castro, and Kays were the Wardens, Chief Deputy Warden, and Associate Warden, respectively, at KVSP. (Soto Dec. ¶ 2, Ex. A-P; Esquivel Decl. Ex. S, Response No. 1.)

5. Between June 2007 and April 2009, when Plaintiff filed this lawsuit, Defendant Soto issued, and Defendants Hedgpeth, Harrington, Castro, or Kays approved, various Program Status Reports (PSR) that affected the normal program, including exercise or recreational yard time, of inmates on Facility B. (Soto Dec. ¶¶ 3, 10-11, Ex. A-P.)

6. When an incident occurred on a yard that impacted or caused a disruption to the normal program on a yard, a PSR was prepared to document why the inmates were on modified program, which inmates were affected, and the event or information that caused the modification. (Soto Dec. ¶ 4.)

7. PSRs were prepared and updated as information becomes available through an investigation into the incident. Each incident that compromised the safety and security of the institution, staff, or inmates resulted in a PSR. It was not uncommon to have two or more PSRs affect different groups of inmates and programming on the yard at the same time. (Soto Dec. ¶ 6.)

8. Part B of the PSR outlined the affected areas or housing units, group of inmates, programs, and privileges. Part B also contained a brief synopsis of the event or information that led to the modified program or updated PSR. (Soto Dec. ¶ 7.)

4

9.  To maintain the safety and security of an institution, staff, inmates, or the public, PSRs were issued at various levels. An incident on a yard could lead to the issuance of a PSR specific to a yard or housing unit. The warden, chief deputy, warden, or associate wardens of a prison issued PSRs that affected the operation of the entire institution. CDCR also issued state-wide PSRs that affected the operation of all the prisons and institutions in its system. (Soto Dec. ¶ 8.)

10. On June 2, 2007, a riot occurred between Black and Hispanic inmates in Building 6 on Facility B at KVSP. Staff discovered numerous weapons, and several inmates received serious injuries. This incident resulted in PSR No. KVP-B-07-024. All Black and Hispanic inmates in Buildings 2 to 8 were placed on modified program, resulting in the denial of recreation yard. (Soto Dec. ¶ 13, Ex. A.)

11. Over the course of the next two and a half months, an investigation was conducted into the incident, including mass cell searches for weapons. The PSR was updated to place all inmates in Buildings 2 to 8 on modified program because of increased threats of violence and the information gathered during the investigation showed that much animosity still existed between Blacks and Hispanics suggesting that further violence was imminent. During this period, and as the investigation continued, the PSR was also modified to allow certain inmates to report to work and other programs and to allow certain groups to return to normal program. (Soto Dec. ¶ 14, Ex. A.)

12. From June 2 to August 16, 2007, Black inmates, including Plaintiff, remained on modified program which included the denial of recreation yard. But these inmates were still allowed out-of-cell time for visiting, medical appointments, showers, and library access if the inmate had a court deadline. (Soto Dec. ¶ 15, Ex. A.)

13. On August 16, 2007, staff learned that ammunition was missing from Building 4 and placed inmates in Buildings 2 to 8 on Facility B on modified program while they searched for the missing equipment. All inmates returned to normal program four days later. (Soto Dec. ¶¶ 16, 14.)

14. On September 15, 2007, two inmates stabbed another on the upper yard on Facility B. The

incident resulted in all inmates in Buildings 2 to 8 being placed on modified program, including the denial of recreation yard.  As a result of the investigation into the incident, the PSR was updated three days later, returning all inmates, except Southern Hispanics and associates, to normal program.  (Soto Dec. ¶ 17, Ex. C.)

15.   On October 26, 2007, prison officials received information of a conspiracy to introduce narcotics and other contraband into the prison.  The Warden or his designee issued an institutionwide PSR placing all inmates on modified program pending an investigation. Inmates were still allowed out-of-cell time for visiting, medical appointments, showers, and library access if they had court deadlines.  Over the course of the next month, mass cell searches of all the yards were systematically conducted, and housing units were returned to normal program as the searches were completed and the investigation revealed more information. Facility B returned to normal program on November 18, 2007. (Soto Dec. ¶ 18, Ex. D.)

16.   On November 28, 2007, prison officials learned that Southern Hispanic inmates on Facility B were promoting violence among other inmate groups, and all Southern Hispanics inmates and their associates on B yard were placed on modified program, resulting in PSR KVP-B-07-052.  On December 13, 2007, inmates of all ethnicities rioted on Facility D, and prison officials believed that the violence could spread to other yards.  The PSR was updated to place all inmates on Facility B in housing units 2 to 8 on modified program, including the denial of recreation yard, pending an investigation.  But a week later, all non-Hispanic inmates returned to normal yard.  (Soto Dec. ¶ 19, Ex. E.)

17.   On February 22, 2008, staff discovered numerous weapons in Building 8 on Facility B.  All inmates in Buildings 7 and 8 were placed on modified program for five days while staff investigated and conducted cell searches in both buildings.  (Soto Dec. ¶ 20, Ex. F.)

18.   All Black and White inmates in Buildings 3 to 8 on Facility B were placed on modified program on March 29, 2008, because staff discovered an inmate with injuries consistent with a stabbing.  Five days later, on April 3, 2008, Black inmates returned to normal program. (Soto Dec. ¶ 21, Ex. G.)

19.    From April 3 to April 5, 2008, CDCR issued a state-wide directive to place all institutions on modified program because of an assault on staff at the California Correctional Institution in Tehachapi. While no inmates were allowed recreation time, inmates were allowed out-of-cell time for visiting, medical appointments, and library access if the inmate had a court deadline. (Soto Dec. ¶ 22, Ex. H.)

20.    On May 17, 2008, all inmates on Facility B, Buildings 3 to 8 were placed on modified program for two days because staff discovered an inmate with injuries consistent with a stabbing. As soon as staff determined that this was an isolated incident, all inmates returned to normal program. (Soto Dec. ¶ 23, Ex. I.)

21.    On June 12, 2008, two inmates stabbed another inmate in the dayroom of Building 3 on Facility B, which resulted in all inmates in Buildings 3 to 8 being placed on modified program. An investigation revealed that this was an isolated incident, and all inmates returned to normal program four days later. (Soto Dec. ¶ 24, Ex. J.)

22.    To avoid a potential outbreak of the chicken pox at the prison, the Warden or his designee at KVSP placed the entire institution on modified program on June 26, 2008. Medical staff investigated the extent of affected inmates, and the inmates on Facility B, except Building 2, returned to normal program on June 30, 2008. (Soto Dec. ¶ 25, Ex. K.)

23.    On July 25, 2008, prison officials received information that Southern Hispanics were engaged in behavior that could lead to violence on Facility B. Southern Hispanic inmates and their associates were placed on modified program under PSR No. KVP-B-08-039. On July 30, 2008, Defendant Soto updated the PSR to include Black inmates in Buildings 3 to 8 because of threats and tension between Black and Hispanic inmates. While the PSR prohibited recreational activities for these groups, the inmates were allowed out-of-cell time for visiting, medical appointments, showers, and library access for court deadlines. Cell searches were conducted, and an investigation was conducted to determine the reasons for the tension and disruptive behavior. (Soto Dec. ¶ 26, Ex. L.)

24.    Black inmates on Facility B returned to normal program on September 23, 2008. But they were briefly placed back on modified program based on information discovered during the

ongoing investigation that they were promoting violence.  All Black inmates returned to normal program on September 25, 2008.  (Soto Dec. ¶ 27, Ex. L.)

25.    On September 24, 2008, prison officials received information that Black inmates were threatening to assault staff, resulting in the inmates being placed on modified program.  After a five-day investigation, Black inmates on Facility B returned to normal program.  (Soto Dec. ¶ 28, Ex. M.)

26.    On March 18, 2009, thirty inmates rioted on the upper yard on Facility B, resulting in all inmates on various yards to be placed on modified program.  Based on the available PSRs, Black inmates returned to normal program sometime before April 2, 2009.  (Soto Dec. ¶ 29, Ex. N.)

27.    In May 2009, CDCR issued a directive to all institutions to prohibit any visitation due to the increased threat of the influenza virus (H1N1) in the State.  No other programs or privileges were affected.  A week later, CDCR lifted the directive.  (Soto Dec. ¶ 30, Ex. O.)

28.    No other incidents or PSRs from June 2007 to April 2009 affected Black inmates, such as Plaintiff.  (Soto Dec. ¶¶ 31-32, Ex. P.)

29.    The modified programs from June 2 to August 16, 2007, and July 30 to September 25, 2008, were the most lengthy modifications that affected Plaintiff's access to the recreation yard. These modified programs were necessary because of the ongoing violence or threats of violence between Black and Hispanic inmates that compromised the safety and security of staff and other inmates.   The denial of recreation yard was necessary because the congregation of inmates in common areas, such as the yard and dining halls, provided inmates with the opportunity to commit assaults, relay information or threats, plan illegal activities, and exchange or obtain weapons or contraband.  (Soto Dec. ¶ 12.)

30.    Because of the fighting and tension between Blacks and Hispanics during the periods in 2007 and 2008, it was unsafe to release these inmates to the yard.  Their release to yard created a risk of more assaults, riots, or other illegal activity that would have resulted in injury or even death to inmates or staff.  Also, releasing one group at a time to the yard to avoid contact between Black and Hispanic inmates was not practical or efficient because of the limited

8

staff available to supervise the inmates, especially when much of staff resources were directed to cell searches due to the ongoing investigation.  Although Black and Hispanic inmates were not allowed recreational activities during these two separate periods, they were allowed out-of-cell time in the form of visiting, medical appointments, showers, and library access for court deadlines.  (Soto Dec. ¶ 12.)

31.   Other than the two incidents in June 2007 and July 2008, Plaintiff was not denied exercise or yard time for any substantial length of time.  (Soto Dec. ¶ 12, Ex. A-P.)

### 3.   **Defendants' Position**

Defendants contend that Plaintiff was only subjected to lengthy or substantial denial of exercise yard on two occasions.  In June 2007 and July 2008, Black and Hispanic inmates were denied access to the exercise yard for over sixty days because of the violence and threats of violence between these two groups.  In June 2007, inmates were subject to modified program status, and Plaintiff was denied out of cell exercise for seventy five days.  In July 2008, inmates were subjected to modified program status, and Plaintiff was denied out of cell exercise for fifty six days.  To protect staff and inmates and to investigate the acts or threats of violence, prison officials reasonably kept these groups on modified program.  (Motion for Summary Judgment 10,[2] ECF No. 52.)

Defendants argue they are entitled to qualified immunity because Defendants acted reasonably in balancing the need to stop the violence or threats of violence with the inmates right to outdoor exercise.  On June 2, 2007, inmates were placed on modified program following a riot between Black and Hispanic inmates at the prison.  Prison officials conducted a systematic search of the inmates involved, interviewed inmates, and investigated the incident.  As the investigation continued inmates were progressively released back onto the regular program.  (Id. at 14.)

Originally the July 2008, incident only affected Southern Hispanic inmates.  However, as the investigation continued it was discovered that tension existed between the Hispanic and Black inmates that was likely to lead to violence.  The inmates were placed on modified programs, while prison officials investigated the source of the tension between the groups and interviewed inmates.

---

[2]All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

(Id.)

Placing the inmates on modified program was necessary due to the threat of violence that compromised the safety and security of the institution, staff, and other inmates. (Id.) The denial of exercise was necessary because allowing the inmates to congregate in the common areas would provide inmates with the ability to commit assaults, relay information or threats, plan illegal activities, or exchange or obtain weapons or contraband. (Id. at 14-15.) Prison officials did not release inmates to the exercise yard because they were concerned that it would have resulted in injury or death to staff or an inmate. Inmates could not be released into the exercise yard in groups because the facility had limited staff to supervise the inmates due to the number of staff involved in the on going investigation of the incidents, cell searches, and inmates interviews. Additionally, this would have given the inmates an opportunity to conspire or plan an attack. (Id. at 15.)

When prison officials encounter the level of violence that existed at KVSP during this time period "they can reasonably believe that it is lawful to temporarily restrict outdoor exercise to help bring the violence under control." Norwood v. Vance, 591 F.3d 1062, 1069 (9th Cir. 2010). Defendants implemented the modified programs in June 2007 and July 2008, because in their judgment and experience, it was the safest and most efficient way to restore order, curb violence, and ensure the safety of inmates and staff. Since the decision of prison officials is entitled to much deference, Defendants' Motion for Summary Judgment should be granted. (Id.)

### 4. Plaintiff's Position

Plaintiff agrees that the denial of exercise for seventy five days in June 2007, and for fifty six days in July 2008, amounted to a substantial deprivation, and claims the remaining PSRs are irrelevant to Plaintiff's claims. (Opp. 4, ECF No. 60.) Plaintiff contends that there was no genuine emergency that justified the continued deprivation of outdoor exercise for the general population once the individuals involved in the altercations were placed in administrative segregation. (Id. at 6.) The California Code of Regulations requires that inmates housed in the general population receive at least three hours of exercise per week and prohibits disciplining inmates by depriving them of outdoor exercise for more than ten days absent extreme circumstances. (Id.); Cal. Code Regs. tit. 15 §§ 1065, 3322.

Plaintiff argues that the Court should not accept Defendants vague logistics concerns as justification for failing to provide adequate exercise.  A reasonable trier of fact, after hearing the evidence might find that Defendants put inconsequential logistic concerns that might be no more than a matter of convenience above Plaintiff's need for exercise.  (ECF No. 60 at 9.)

### 5.   **Eighth Amendment Legal Standard**

"[W]hile conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.'" Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392 (1981)).  The Eighth Amendment, which protects prisoners from inhumane conditions of confinement, Farmer v. Brennan, 511 U.S. 825, 833, 114 S. Ct. 1970 (1994), is violated when prison officials act with deliberate indifference to a substantial risk of harm to an inmate's health or safety, e.g., Farmer, 511 U.S. at 828; Thomas, 611 F.3d at 1151-52; Richardson v. Runnels, 594 F.3d 666, 672 (9th Cir. 2010).

In order to show an Eighth Amendment violation, two requirements must be met.  Farmer, 511 U.S. at 834.  First, the deprivation must be, objectively, sufficiently serious.  Id. (quotation marks and citation omitted).  The objective component is contextual and responsive to contemporary standards of decency.  Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995 (1992) (quotations marks and citation omitted).  Extreme deprivations are required to make out an Eighth Amendment conditions-of-confinement claim.  Hudson, 503 U.S. at 9 (quotation marks and citation omitted).  Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.  Id. (quotation marks and citations omitted).

Second, prison officials must have a sufficiently culpable state of mind, which for conditions-of-confinement claims is one of deliberate indifference.  Farmer, 511 U.S. at 834 (quotation marks omitted).  Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety.  Farmer, 511 U.S. at 837 (quotation marks omitted).  Thus, prison officials may be held liable under the Eighth Amendment for denying humane conditions of

1  confinement only if they know that inmates face a substantial risk of harm and they disregard that

2  risk by failing to take reasonable measures to abate it.  Id. at 847 (quotation marks omitted).

3       Inmates have a constitutional right to exercise and the denial of out-of-cell exercise for an

4  extended period of time is sufficiently serious to state a claim under the Eighth Amendment.

5  Thomas, 611 F.3d at 1151-52.  No bright line exists in terms of how many hours of out-of-cell

6  exercise per week satisfy the Constitution.  Noble v. Adams, 646 F.3d 1138, 1139-41 (9th Cir. 2011)

7  (no outdoor exercise or other privileges for approximately sixteen months); Hebbe v. Pliler, 627 F.3d

8  338, 343-44 (9th Cir. 2010) (inmate permitted out of his cell for only eight hours a week and

9  impermissibly required to choose between exercise and law library access during those hours);

10  Thomas, 611 F.3d at 1151-52 (no out-of-cell exercise for thirteen months); Pierce v. County of

11  Orange, 526 F.3d 1190, 1211-13 (9th Cir. 2008) (at least two days a week for at least two hours total

12  per week sufficient exercise); LeMaire, 12 F.3d at 1457-58 (no out-of-cell exercise for most of a

13  five-year period); Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994) (in-cell confinement for almost

14  twenty-four hours a day and forty-five minutes of outside exercise per week for a six-week period);

15  Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (fewer than five hours of exercise per week

16  and no outdoor exercise for some inmates over a period of years).  Short-term, temporary

17  deprivations of exercise without medical effects are not sufficiently serious to support an Eighth

18  Amendment claim, Thomas, 611 F.3d at 1155; Norwood, 591 F.3d 1062, 1070 (9th Cir. 2010); May

19  v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997); Allen, 48 F.3d at 1088, but the deprivation of

20  exercise for a period of six weeks can support a claim, Allen, 48 F.3d at 1088.

21       **6.**   **Discussion**

22       **a.**   **Objective Element - Sufficiently Grave Condition**

23       Defendants contend, and Plaintiff agrees, that the lockdowns which occurred from June 2007

24  through April 2009 were short term and not sufficient to form the basis of a denial of exercise claim.

25  The lockdowns during this time period lasted from two to twenty three days.  These short-term,

26  temporary deprivations of exercise without medical effects are not sufficiently serious to support an

27  Eighth Amendment claim.  Thomas, 611 F.3d at 1155; Norwood, 591 F.3d 1062, 1070 (9th Cir.

28  2010); May, 109 F.3d at 565.

1   Defendants do not argue that due to the lockdowns beginning June 2, 2007, and July 30,

2   2008, Plaintiff was not subjected to conditions sufficiently grave to form the basis of an Eighth

3   Amendment claim.  The lockdowns lasted seventy five and fifty six days, respectively, and Plaintiff

4   alleges the lack of exercise caused him medical problems.  Therefore, limited to the resolution of this

5   motion, the Court assumes without deciding that the deprivations at issue on June 2, 2007 and June

6   30, 2008, were sufficiently grave to satisfy the objective element of an Eighth Amendment claim.

7   **b.   Subjective Element - Deliberate Indifference**

8   Plaintiff has not submitted evidence to dispute that the program modifications on June 2,

9   2007 and July 30, 2008, were instituted in response to a serious risk to the institution.  Plaintiff does

10   not submit evidence to dispute, or argue, that following the program modifications prison officials

11   took action to investigate the incidents that resulted in the lockdown.  Plaintiff's position is that once

12   the individuals who were involved in the original incidents were removed from the general

13   population no real emergency existed, and there was no justification for the continued denial of

14   exercise to the general population.

15   Although Plaintiff argues that once the inmates involved in the riot or causing a threat of

16   violence were placed in administrative segregation, the emergency no longer existed and the general

17   population should have been returned to normal programing, Plaintiff offers only his bare, lay

18   opinion on these issues.[3]  Regardless, Plaintiff's disagreement with how prison officials responded

19   to the riot would not raise a triable issue of fact under these circumstances.  Defendants have a duty

20   to restore order following riots and to ensure the safety of the inmates and correctional staff.  Noble,

21   646 F.3d at 1143-48; Norwood, 591 F.3d at 1069-70.  As discussed below, their investigation was

22   a reasonable precaution, and Defendants have no way of knowing beforehand what the investigation

23   will reveal.  Norwood, 591 F.3d at 1070.  Their response to the threat presented was well within the

24   wide-ranging discretion to which they are entitled.  Noble, 646 F.3d at 1143-48; Norwood, 591 F.3d

25   at 1069-70.

26

27   _____

28   [3] Plaintiff has no expertise in prison management and he may not offer as evidence his own opinion on matters which require scientific, technical, or other specialized knowledge.  Fed. R. Evid. 701, 702.  Plaintiff is limited to testifying on admissible matters to which he has personal knowledge and the competency to testify.

i.   **June 2, 2007 Modified Program**

On June 2, 2007, a riot occurred between Black and Hispanic inmates in Building 6 on Facility B at KVSP.  Staff discovered numerous weapons, and several inmates received serious injuries.  This incident resulted in PSR No. KVP-B-07-024 being issued, and all Black and Hispanic inmates in Buildings 2 to 8 were placed on modified program, resulting in the denial of recreation yard.  (UF 10.)  Over the course of the next two and a half months, an investigation was conducted into the incident, including mass cell searches for weapons.  The PSR was updated to place all inmates in Buildings 2 to 8 on modified program because of increased threats of violence and the information gathered during the investigation showed that much animosity still existed between Blacks and Hispanics suggesting that further violence was imminent.  During this period, and as the investigation continued, the PSR was also modified to allow certain inmates to report to work and other programs and to allow certain groups to return to normal program.  (UF 11.)

From June 2 to August 16, 2007, Black inmates, including Plaintiff, remained on modified program which included the denial of recreation yard.  (UF 12.)  On August 16, 2007, staff learned that ammunition was missing from Building 4 and placed inmates in Buildings 2 to 8 on Facility B on modified program while prison officials searched for the missing equipment.  All inmates returned to normal program four days later.  (UF 13.)

PSR No. KVP B-07-04 issued in response to the riot on June 2, 2007, and Black and Hispanic inmates were allowed no recreational activities.  (Soto Dec. 9, ECF No. 52-2.)  The PSR states that

> [o]n Saturday, June 2, 2007, at approximately 0654 hours, a riot occurred at Kern Valley State Prison, Facility B, in Housing Unit number 6, between 7 Black and 8 Hispanic inmates.  The involved inmates were released for the morning meal and without provocation, became involved in a riot.  Numerous weapons were used, resulting in sustained serious injuries.  The incident was quelled by the firing of 3 direct impact rounds.  Based on the aforementioned, Facility B will be on Modified Program Status pending completion of a systematic search, the interview process and completion of an investigation into this incident.

(Id.)

On June 4, 2007, the PSR was updated and all inmates were affected because "[o]n Sunday,

June 3, 2007, a statement was made by an inmate in visiting indicating the issues have not been resolved and may affect the visiting program.  Black and Hispanic visits have therefore been restricted in this Modification Order Update." (Id. at 10.)  On June 7, 2007, the PSR was updated to restrict shower access to one inmate per shower, to allow whites and other inmates back to normal movement, access to the canteen and package delivery, and to allow medical ducats, stating,

> [i]f needed food handling cleared Facility B Gym inmates can be utilized in place of Level IV Culinary workers.  White and other IAC/MAC members can be used to communicate the PSR to the general inmate population.  Two Black and Two [sic] Hispanic IAC or MAC members may be used to communicate with staff and the General inmate population.  (These ethnics will not be allowed to be outside their cell/housing unit with eachother [sic]).

(Id. at 11.)

On June 8, 2007, the PSR was updated to restrict visiting for Blacks and Hispanics noting that "[p]reliminary information reflects a need for effective communication within and between the involved ethnicities prior to consideration for normal visiting privileges." (Id. at 12.)  On June 11, 2007, the PSR was updated to give Black and Hispanic inmates canteen access, and to allow critical workers to receive packages.  (Id. at 13.)  The PSR was updated on June 13, 2007, stating "[w]ith approval of the on duty Lieutenant Two [sic] Black and Two [sic] Hispanic IAC members . . . may be used to communicate with staff and the General inmate population.  These inmates may enter section of the housing units together.  All Hispanic and Black IAC movement shall be in waist restraints." (Id. at 14.)

On June 20, 2007, the PSR was updated to apply only to Black and Hispanic inmates.  (Id. at 15.)  On June 25, 2007, the PSR was updated to allow normal visiting for Black and Hispanic inmates and to allow for classification ducats.  (Id. at 16.)  On July 2, 2007, the PSR was updated to allow Black and Hispanic inmates to be escorted to sick call.  (Id. at 17.)  On July 5, 2007, the PSR was updated to allow normal package delivery and access to the canteen for Black and Hispanic inmates and to allow critical clerks and porters in the visiting and support office to return to work.  (Id. at 18.)

On July 11, 2007, the PSR was updated to allow movement of Black and Hispanic inmates under escort by Custody Staff.  (Id. at 19.)  On July 18, 2007, the PSR was updated to include all

inmates assigned to B6 due to inmate manufactured weapons being found in the housing unit, and to allow critical culinary workers to return to work. (Id. at 21.) On July 21, 2007, the PSR as updated to include all inmates assigned to all inmates in housing unit B2-8 due to inmate manufactured weapons, drugs and other dangerous contraband being found in cells of inmates in housing unit no. 6. Phone calls were permitted for critical workers. (Id. at 22.)

On July 25, 2007, the PSR was updated to reflect that inmate manufactured weapons, drugs and other dangerous contraband were found in the possession of inmates assigned to Housing Units nos. 8, 6, and 4. Additionally, weapon making materials were found in Housing Unit 3. (Id. at 23.) On July 31, 2007, the PSR was updated to apply to only Black and Hispanic inmates. Additional workers were allowed to return to work and the canteen, visiting, phone calls, showers, and medical program were returned to normal. The PSR noted that "[s]taff have subsequently identified and removed inmates suspected of causing continued unrest amongst the inmate population. As reflected in this update, additional inmate movement is being initiated to progress to total normal operations as soon as it is safe and practical to do so." (Id. at 24.) On August 7, 2007, the PSR was updated to return educational and dayroom activity to normal operations. (Id. at 25.)

On August 8, 2007, the PSR was updated to reflect that weapons and weapon making materials were discovered in Housing Unit B4, and all inmates in B4 were confined to their cells pending further review. (Id. at 26.) On August 14, 2007, the PSR reflects that all inmate workers, educational and vocational assignments were approved and normal feeding resumed for the evening meal. (Id. at 27.) On August 16, 2007, the Facility B inmate population returned to normal programming. (Id. at 28.)

On August 16, 2007, PSR KVP-B-07-032 issued due to staff discovering that sensitive state equipment was missing from building B4. A search of the common areas had negative results and due to the nature of the missing equipment all inmates in Facility B, Units 2 through 8 were placed on modified program. (Id. at 30.) On August 20, 2007, the inmate population returned to normal

operations after searches had been completed.[4]  (Id. at 31.)

Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights. Bell v. Wolfish, 441 U.S. 520, 545-46, 99 S. Ct. 1861 (1979) (citation and quotation marks omitted); also Hudson v. Palmer, 468 U.S. 517, 524, 104 S. Ct. 3194 (1984).  It is well-established that the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions, and prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security. Bell, 441 U.S. at 545-46 (quotation marks omitted); also Whitley v. Albers, 475 U.S. 312, 321-22, 106 S. Ct. 1078 (1986); Rhodes v. Chapman, 452 U.S. 337, 348-51, 101 S. Ct. 2392 (9th Cir. 1981); Noble, 646 F.3d at 1143; Norwood, 591 F.3d at 1066.

A prisoner's right to outdoor exercise is neither absolute and indefeasible, and it does not trump all other considerations. Norwood, 591 F.3d at 1068.  For the benefit of prisoners, as well as staff, prison officials have a duty to ensure the safety and security of the institution, and this imperative must be balanced against other legal obligations, including outdoor exercise. Id. at 1069. Prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost, id. (quotation marks and citation omitted), and they are entitled to wide-ranging deference in discharging their responsibility, so long as that deference does not manifest deliberate indifference or an intent to inflict harm, Noble.  646 F.3d at 1143.

In this instance, the lockdown or modified program was instituted in response to a riot that involved fifteen Hispanic and Black inmates.  Weapons were used by the inmates, and several inmates received serious injuries.  Plaintiff does not dispute that the initial lockdown was due to a genuine emergency, and the Court finds that the riot involving fifteen Black and Hispanic inmates would constitute a genuine emergency justifying Defendants decision to place the facility on modified program to ensure the safety of staff and inmates.

---

[4]Although the parties do not include these four days in their calculation of the deprivation of exercise, since this PSR went into effect on the date the prior PSR returned inmates to the normal program, the Court shall consider this in determining if a triable issue exists.

During the investigation that took place within the first few days following the riot, it was determined that there was much animosity between the Black and Hispanic inmates causing prison officials to believe that further violence was imminent.  Additionally, during cell searches weapons, weapon making material, drugs, and dangerous contraband were found in the cells of inmates housed in Facility B.

While the Court finds that this is a close call based upon the scant evidence provided by Defendants in this case, the evidence shows that prison officials conducted an investigation and slowly eased the restrictions as they deemed appropriate, with exercise privileges being one of the last to be restored.  The process took approximately seventy-five days to complete.  The Court is not in the position to lightly second-guess the expert judgment needed to make these decisions, Norwood, 591 F.3d at 1069, or otherwise micromanage prisons. Noble, 646 F.3d at 1143.

There is simply no evidence raising a genuine dispute as to any material fact regarding the need for the lockdown/modified program or the need to lift the lockdown in measured phases. Noble, 646 F.3d at 1144; Norwood, 591 F.3d at 1070.  In short, there is no evidence that Defendants acted with deliberate indifference in approving the seventy five day modified program.  Noble, 646 F.3d at 1147-48.  Similarly, on the day the modified program was lifted it was discovered that ammunition was missing from the facility, and a four day modified program ensued while prison officials searched for the missing equipment.  Although this did extend the lockdown by an additional four days, prison officials had adequate justification to discover if the ammunition was in the possession of inmates, and the four day modified program was reasonable.  Accordingly, the Court finds that Defendants did not violate Plaintiff's Eighth Amendment rights, and it recommends that Defendants be granted judgment as a matter of law on Plaintiff's claim arising out of the June 2, 2007, modified program.

### ii.      July 30, 2008 Modified Program

On July 25, 2008, Southern Hispanic inmates and their associates were placed on modified program under PSR No. KVP-B-08-039, because prison officials received information that they were engaging in behavior that could lead to violence on Facility B.  On July 30, 2008, Defendant Soto updated the PSR to include Black inmates in Buildings 3 to 8 because of threats and tension between

Black and Hispanic inmates.  Cell searches were conducted, and an investigation ensued to determine the reasons for the tension and disruptive behavior.  (UF 23.)  Black inmates on Facility B returned to normal program on September 23, 2008.  (UF 24.)  But they were briefly placed back on modified program on September 24, 2008, because prison officials received information that Black inmates were threatening to assault staff.  After a five-day investigation, Black inmates on Facility B returned to normal program.  (UF 25.)

PSR No. KVP-B-08-39 was updated on July 30, 2008, stating, "[o]n July 30, 2008, staff confirmed that the Southern Hispanics and Black inmate populations are engaging in behavior which will likely lead to violence.  All Southern Hispanics and Associates to include cellmates and Black inmates will remain on modified program pending further investigation into this matter." (ECF No. 52-4 at 3.)  On August 1, 2008, the PSR was updated to allow some workers to return to work and to modify package delivery.  (Id. at 5.)  On August 4, 2008, the PSR was updated to allow White and Non-Southern Hispanic inmates access to the yard.  (Id. at 6.)  On August 6, 2008, the PSR was updated to allow normal movement for White and Non-Southern Hispanic inmates.  All inmates were placed on modified program to allow for cell searches and inmate interviews.  (Id. at 7.)

On September 3, 2008, the PSR was updated stating, "[s]earch operations will be conducted separately.  At no time will Black/Southern Hispanic inmates have contact with each other."  The order also removed the authorization for inmate workers and yard access, and granted canteen access for personal hygiene items and stationary.  (Id. at 8.)  On September 18, 2008, the PSR was updated to allow normal visiting for Black inmates and non-contact visits for Hispanic inmates.  (Id. at 9, 10.)  On September 23, 2008, the PSR was updated returning Black inmates to normal programming.  (Id. at 11.)

Plaintiff does not dispute that the initial lockdown was due to a genuine emergency, and the Court finds that, based upon the information available to prison officials, the racially motivated violence that had been occurring following the riot, and the stabbing incidents of May 17 and June 12, 2008, Defendants decision to place the facility on modified program to ensure the safety of staff and inmates was reasonable.  Once the facility was placed on modified program, prison officials conducted an investigation to determine the cause of the racial tension and inmates' cells were

searched.

Defendants contend that inmates could not be released into the exercise yard in groups because the facility had limited staff to supervise the inmates due to the number of staff involved in the on going investigation of the incidents, cell searches, and inmates interviews.  Plaintiff argues that these are vague logistical concerns which are no more than a matter of convenience and should not be placed over his right to exercise.

In Allen, prison officials argued that they were unable to provide adequate exercise for inmates because, for security reasons, inmates had to be accompanied by a prison guard and only one inmate could use the exercise yard at a time.  Allen, 48 F.3d at 1088.  The court found a reasonable trier of fact could find that the defendants were deliberately indifferent by placing vague logistical concerns, which might be no more than a matter of convenience, over the inmates' right to exercise. Id.

The situation in this instance is distinguishable from the vague logistical concerns set forth in Allen.  Defendants have set forth evidence that prison staff were involved in investigating the incidents, interviewing inmates, and conducting cell searches.  These are not vague logistical concerns, but necessary functions that occupied the correctional staff given the situation that existed at the time, and thereby less staff would be available to supervise groups of inmates on the recreation yard.  Institutional and prisoner safety are fundamental functions of the prison management.  The Court rejects Plaintiff's argument as a matter of law that Defendants used vague logistical concerns to deny access to the exercise yard.

While Defendants claim that the denial of exercise was necessary because allowing the inmates to congregate in the common areas would provide inmates with the ability to commit assaults, relay information or threats, plan illegal activities, or exchange or obtain weapons or contraband, Defendants have not presented evidence to show that the modified program was necessary for entire period it was instituted.  Although Defendants argue that inmates were not released to the exercise yard because prison officials were concerned that it would have resulted in injury or death to staff or an inmate, Defendants have failed to present any evidence that a threat continued to exist during the entire period of the lockdown.

The Court finds that Defendants have failed to meet their burden of providing evidence sufficient to show that Plaintiff's rights under the Eighth Amendment were not violated during the modified program which began on July 30, 2008.  There is a triable issue as to whether Defendants were deliberately indifferent to Plaintiff's right to exercise by continuing the modified program until September 23, 2008.

### 7.    Qualified Immunity

The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine if an official is entitled to qualified immunity the court uses a two part inquiry.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  The court determines if the facts as alleged state a violation of a constitutional right and if the right is clearly established so that a reasonable official would have known that his conduct was unlawful.  Saucier, 533 U.S. at 200.  A district court is "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S. Ct. at 818.  The inquiry as to whether the right was clearly established is "solely a question of law for the judge." Dunn v. Castro, No. 08-15957, 2010 WL 3547637, at *2 (9th Cir. Sept. 14, 2010) (quoting Tortu v. Las Vegas Metro. Police Dep't. 556 F.3d 1075, 1085 (9th Cir. 2009)).

As discussed above, the Court has found that there is a triable issue regarding whether the modified program instituted on July 30, 2008 was continued in deliberate indifference to Plaintiff's right to outdoor exercise.  The second prong requires the court to determine if the law was clearly established at the time Plaintiff was subjected to the modified program.

It is not clearly established exactly how or when prison officials must lift a lockdown or modified program implemented in response to threats to the safety and security of the institution arising from riots or information that inmates plan to assault staff.  Noble, 646 F.3d at 1143; Norwood, 591 F.3d at 1070.  In light of the undisputed evidence regarding the reasons for the lockdowns/modified programs, the investigatory steps undertaken in responding to the events, and

that prison officials lifted lockdowns/modified programs in stages depending upon the results of the investigations, it would not have been clear to a reasonable officer that restricting an inmate's outdoor exercise in conjunction with the lockdowns/modified programs during investigations at issue here was unlawful.  Therefore, Defendants Hedgpeth, Harrington, Castro, Kays, and Soto are entitled to qualified immunity for the modified programs instituted on June 2, 2007, and July 30, 2008.

**III.    Conclusion and Recommendations**

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.    Defendants' motion for summary judgment, filed December 12, 2011, be GRANTED; and

2.    Judgment be entered on behalf of Defendants and against Plaintiff.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these findings and recommendations, Plaintiff may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    **May 25, 2012**              **/s/ Barbara A. McAuliffe**
                                              UNITED STATES MAGISTRATE JUDGE